# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RENE FLORES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 13-075-SLR |
| | ) |
| CARL C. DANBERG, MIKE DELOY, | ) |
| G.R. JOHNSON, LINDA VALENTINO, | ) |
| and DELAWARE DEPARTMENT OF | ) |
| CORRECTION. | ) |
| | ) |
| Defendants. | ) |

Stephen A. Hampton, Esquire, Dover, Delaware. Counsel for Plaintiff.

Devera B. Scott, Esquire and Ryan P. Connell, Esquire, Deputy Attorneys General. Department of Justice, Dover, Delaware. Counsel for Defendants.

## MEMORANDUM OPINION

Dated: March 24, 2015
Wilmington, Delaware

*signature* **ROBINSON, District Judge**

## I. INTRODUCTION

This employment discrimination case was initiated by plaintiff Rene Flores ("plaintiff") against defendants Carl C. Danberg ("Danberg"),[1] Mike DeLoy ("DeLoy"),[2] G.R. Johnson ("Johnson"),[3] Linda Valentino ("Valentino"),[4] and the Department of Correction ("DOC"). (D.I. 1, 23) Plaintiff asserts that defendants: (1) discriminated against him based on his race and national origin; and (2) retaliated against him, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. §§ 1981 and 1983, as well as the First and Fourteenth Amendments of the United States Constitution. Plaintiff also includes state tortious interference claims and violations of the Delaware Whistleblowers' Protection Act, 19 Del. C. §§ 1703 and 1703(4). The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

Presently before the court are defendants' motions for summary judgment. (D.I. 64, 67) The issues are fully briefed. (D.I. 65, 66, 68, 69, 70, 71, 72, 73, 74, 75, 82, 83, 84, 85, 86, 88) For the reasons that follow, defendants' motions for summary judgment will be granted.

## II. BACKGROUND

_____

[1]Former Commissioner of the Department of Correction ("DOC"). (D.I. 23)

[2]Former Bureau Chief of the DOC. (D.I. 23)

[3]Warden of the Sussex Correctional Institution ("SCI"). (D.I. 70 at DA191)

[4]Deputy Warden of SCI. (D.I. 70 at DA101)

Plaintiff,[5] a Hispanic male, graduated from the DOC's academy in 1994 and was assigned to the Delaware Correctional Center, now known as James T. Vaughn Correctional Center ("JTVCC"). (D.I. 70 at DA343-344) In 1996, plaintiff was promoted to corporal and transferred to Sussex Boot Camp. (*Id.* at DA344-346) In 1998, he was transferred to SCI. In July 2001, plaintiff was promoted to sergeant and transferred to Morris Community Correctional Center.

In September 2001, plaintiff was promoted to lieutenant and transferred to JTVCC. (*Id.* at DA348) In 2002, he was transferred back to Sussex Boot Camp and, approximately a year later, was transferred to SCI with the rank of lieutenant.

In 2009, plaintiff interviewed for a vacant staff lieutenant position, but was not selected as a candidate. (D.I. 69 at DA70-71) Plaintiff filed a grievance, challenging the promotion selection process. Defendant DeLoy heard the grievance, found merit to plaintiff's contentions and recommended promotion. (*Id.* at DA6) However, because another candidate had already been selected, plaintiff was promoted to a different staff lieutenant position, with adjusted back pay.

In 2010, plaintiff applied for a vacant captain position. (*Id.* at DA24; D.I. 70 at DA415) At that time, the committee[6] considering candidates for positions with the rank of captain and higher, used a numerical score sheet to evaluate and rank both objective and subjective categories for each applicant. (D.I. 70 at DA226, DA119) Plaintiff was

---

[5]Plaintiff identifies his ethnicity as Aztec Indian; his father is Mexican and mother is Caucasian. (D.I. 70 at DA321-322) Plaintiff was a member of the United States Army from May 1987 to August 1994. (*Id.* at DA325-326) Plaintiff joined the Air Force Reserves in 1994 and retired in May 2008. (*Id.* at DA328)

[6]Panels were comprised of three members. (D.I. 69 at DA108)

2

not the candidate selected for the position. (D.I. 69 at DA76) He filed a grievance

challenging the selection process, which was later denied. (Id. at DA77)

Subsequently, after learning that the other DOC wardens had abandoned using

numerical score sheets in favor of a more subjective candidate evaluation process

("subjective system"), defendant Johnson implemented the same procedure at SCI.

(D.I. 70 at DA226-227; DA122) The advantages of the subjective system were

explained by defendant Valentino:

> I can't give you a specific. But typically, the discussion is you get the
> wrong candidate because you get somebody that high seniority or
> doesn't have the drive or the knowledge to do the job, and they knock
> out other people. So they might have education, high seniority. And
> somebody else who is a better candidate for the position encompassing
> all of the qualifications would get knocked out of it because of it. And it
> allows us to pick the best candidate, period.

(D.I. 70 at DA119)

In 2011, when a captain position became vacant, defendant Valentino chose

Ernest McBroom, DOC trainer/educator, and Jeannette Christian, DOC human

resources, as members of the selection panel ("the panel")[7] responsible for filling the

vacancy. (D.I. 70 at DA0121-22; DA428) Plaintiff[8] submitted an application for the

captain position. (Id. at DA427) The panel interviewed candidates in March 2011. (D.I.

70 at DA124)

---

[7]Defendant Valentino was chair of the panel.

[8]Plaintiff was considered a good employee, who volunteered frequently for
additional responsibilities, requested training opportunities, and pursued career
advancement. (D.I. 80 at PA313-354) From 2007 to 2011, plaintiff attended
approximately 55 training/educational classes. (D.I. 69 at DA05)

3

On April 8, 2011, Ryan Hobbs ("Hobbs") contacted the SCI's warden's office, complaining that plaintiff had accessed Hobbs' criminal record illegally through the DELJIS[9] system and had disseminated the information. (D.I. 80 at PA147; D.I. 69 at DA31) As part of an Internal Affairs ("IA") investigation launched in response to the complaint, investigator Michael Tigue ("Tigue") interviewed Hobbs and discovered that: (1) Hobbs was dating plaintiff's daughter Chelsea; (2) plaintiff accessed Hobbs' criminal record between 2008 and February 2009 and shared this information with others, resulting in Hobbs' being arrested for drugs and his residence searched; (3) Chelsea and Hobbs had domestic problems, resulting in Chelsea obtaining a restraining order; and (4) Hobbs waited to report plaintiff's alleged misconduct because "[Hobbs] has been in court over issues with [Chelsea] for violating the restraining order." (D.I. 80 at PA147)

Tigue was unable to verify whether plaintiff had in fact accessed Hobbs' information because the DELJIS records for the pertinent time period were inaccessible. (*Id.* at PA148) Consequently, Tigue reported that, "[without supporting documentation from DELJIS, the allegations made by Hobbs [were] unsubstantiated" and the IA investigation case was closed. (*Id.*)

In a letter dated April 15, 2011, defendant Valentino announced the panel's selection for the captain position. The panel unanimously agreed that the top candidate

---

[9]"Delaware Criminal Justice System." DELJIS is "the central state agency responsible for providing efficient and reliable development and operation of the hardware, software, network and database which comprise the Criminal Justice Information System ("CJIS"). *See* http://deljis.delaware.gov/whatwedo.shtml (last visited on March 16, 2015).

was "JB," a Caucasian, male lieutenant with bachelors and associates degrees in criminal justice technology, perfect attendance during a two-year period, and experience as a watch commander.[10] (D.I. 69 at DA25) The panel's second choice, "DV", a Caucasian, male staff lieutenant with no college education. (D.I. 69 at DA25) Plaintiff was the third ranked candidate.[11] (Id. at DA 25-26; D.I. 70 at DA123-24)

In explaining the panel's reasons for choosing JB for the position, defendant Valentino wrote:

> The selection panel was unanimously impressed by the interview with JB. His answers were thorough, concise and well articulated. The panel agreed that it was one of the best interviews we had witnessed in a long time. DV's interview was very good as well, although he struggled with a few of the questions.

(D.I. 69 at DA25-26) Defendant Valentino testified that, at his interview, plaintiff stumbled with some of his responses. (D.I. 70 at DA123-124) Jeannette Christian's interview notes reflect that plaintiff "rambled" at points. (D.I. 69 at DA22-24) Plaintiff testified that the interview went very well and that the questions presented were easy. (D.I. 70 at DA431 - 434) On May 24, 2011, plaintiff filed a grievance, complaining that the captain selection process was deficient because: (1) the panel did not use an objective score sheet; and (2) the panel members had never served as a watch commander or as a captain. (Id. at DA440-48)

During this same time period, DELJIS commenced an investigation into Hobbs' complaint as well. In a June 23, 2011 memorandum, the DELJIS Executive Committee

---

[10]On his last evaluation, JB received ratings of "exceeds qualifications." (D.I. 69 at DA25)

[11]Plaintiff had more tenure and experience than JB. (D.I. 69 at DA27)

5

decided that plaintiff should re-sign the DELJIS directive #1 and attend security training within 60 days. (D.I. 80 at PA149-150) Plaintiff successfully completed the training and signed the directive within the designated time period.

On June 28, 2011, Tigue interviewed plaintiff as part of a "continuing" investigation into the DELJIS violations. (D.I. 80 at PA151) In further explaining the searches, plaintiff stated that, as watch commander, he occasionally had to run registration numbers of vehicles parked in the SCI parking lot. (*Id.*) Tigue advised that plaintiff's conduct violated DOC policy relating to DELJIS and DOC computer use. (*Id.* at PA152) The investigation was closed.

On July 13, 2011, Truman Mears ("Mears"), SCI Security Superintendent, commenced a disciplinary investigation into the DELJIS matter. (D.I. 70 at DA132; D.I. 80 at PA153) Mears interviewed plaintiff, who had "nothing to add to what [he had] stated to IA." (D.I. 80 at PA153) Mears reviewed DELJIS logs and memos, IA memos, DELJIS directives, and a previously recorded interview of plaintiff.

In a disciplinary investigation report dated August 2, 2011, Mears concluded that plaintiff violated DELJIS directive #1, which prohibits the dissemination of criminal history and motor vehicle records. In support of this conclusion, Mears determined that plaintiff used DELJIS to access the criminal history of: (1) Hobbs, on 16 occasions; (2) "BG," a friend of Hobbs, two times; and (3) another 27 individuals, accessed on multiple occasions. (*Id.* at PA154) Of these 29 people ("the list"), Mears found only one name on the list who was a possible visitor at SCI.

On August 8, 2011, defendant DeLoy conducted a hearing to consider plaintiff's grievance over the captain position hiring process. Plaintiff and union representatives

6

were present. (D.I. 69 at DA34) Plaintiff claimed that he was not selected for the

position because he is Hispanic and that the selection process discriminated against

him. (D.I. 69 at DA34) More specifically, he asserted that he had more experience with

the duties of a captain than JB and had completed the "management development for

the future program." (Id.) Plaintiff also objected to the composition of the panel,

arguing that none of the members had ever served as a watch commander and the

members should have been chosen from an OMB list.

Defendant DeLoy denied the grievance for the following reasons:

After reviewing the selection process as it occurred at SCI, it is no
way different than the selection process for captain at any other Level
5 Facility. The interview panel was diverse, experienced, educated,
and in [DeLoy's] opinion, was not discriminating in any way.

(D.I. 69 at DA35)

On September 21, 2011, plaintiff filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC"). He alleged:

In May of 2011, I applied for a poistion as a watch commander at the
rank of captain. Despite being qualified for this position, I was not
selected for this position. Rather, a less experienced and lesser
qualified individual [JB] (not Hispanic) was selected.
Based on the above, I believe that I was not selected because I am
Hispanic, in violation of Title VII of the Civil Righst Act of 1964, as
amended.

(D.I. 69 at DA36)

In a letter dated November 29, 2011, defendant Johnson advised that plaintiff

was being considered for disciplinary action due to an external complaint that plaintiff

had illegally accessed DELJIS and "used that information to threaten the complainant."

(Id. at PA156) Defendant Johnson instructed plaintiff that he was entitled to a fact-

7

finding meeting to present "any reason why" disciplinary action was unwarranted. (*Id.*)

On January 17, 2012, defendant Johnson held a fact-finding meeting with plaintiff and a union representative. (*Id.* at PA161) During the meeting, plaintiff said that he had accessed DELJIS because "apparently there had been an ongoing social relationship between plaintiff's daughter and Hobbs. At some point there was police intervention between the two, thus prompting court action." (*Id.*)

In response, defendant Johnson identified the individuals on the list[12] and inquired the reason for the searches. Plaintiff provided the following explanations: (1) nine people on the list were his family members and in order to stay proficient, DELJIS trainers recommended users to look up family members; (2) ten people were probably inmates or visitors at SCI because plaintiff did not know them; (3) one of his duties as watch commander was to check the visitors and/or tag numbers of vehicles in the SCI parking lot; (4) the deputy warden asked plaintiff to look up the son of the former warden; (5) plaintiff explained the relationship between his daughter and Hobbs; and (6) plaintiff denied disseminating or threatening Hobbs with the accessed information, and only checked DELJIS to find court dates for his daughter. (*Id.*)

On January 25, 2012, defendant Johnson informed Bureau Chief Karl Hines that the explanations given by plaintiff were unbelievable, deceptive and unsupported by the evidence uncovered during the investigations. Defendant Johnson requested that

---

[12]Defendant Johnson had determined that the list included: nine members of plaintiff's family (including biological daughters and ex-boyfriends of plaintiff's ex-wife), three former employees at SCI, a son of a retired deputy warden, and four high profile offenders, including Dr. Earl Bradley, who was accessed several times. (D.I. 80 at PA161-163)

8

plaintiff be terminated for his gross abuse of privileges.[13]   (D.I. 69 at DA41-43; D.I. 70

at DA483)

On February 6, 2012, Director of Human Resources, Janet Durkee ("Durkee"),

informed plaintiff that the DOC was considering dismissing him from employment based

on the results of its investigation. (D.I. 69 at DA44) Specifically, the investigation

revealed that plaintiff had:

> (1) accessed criminal history record information in DELJIS without business-
> related reasons; (2) failed to cooperate and being dishonest with the
> DELJIS and IA investigators by misrepresenting [his] unauthorized searches
> as work-related; and (3) performed non-work related, unauthorized
> DELJIS searches while on State time.

---

[13]In his deposition, defendant Johnson described how he reached the decision to
terminate plaintiff,

> I looked it all over. I called up to talk to the HR director, Janet [Durkee].
> I conferred with her on it. I think she may have checked with somebody
> else. I'm not sure. And we talked about it, and we kind of mulled it over
> and pondered it. And I really couldn't make my mind up, other than the
> fact of being so many inquiries, what was perceived to be less than
> honest, considering the fact that there was an external complaint lodged
> by someone. Whether that was validated or not, that's what generated
> it all. So it's in the public sector. And I opted to proceed this way.

(D.I. 70 at DA234)

(*Id.* at DA44) Durkee[14] advised, prior to a final determination, that plaintiff was entitled to a pre-decision meeting in order to present any reasons why dismissal was inappropriate.

A human resources search revealed two other SCI employees had committed DELJIS violations. (D.I. 66 at A19) One, "AS," was initially deceptive and could not recall certain information until confronted with evidence substantiating the charges. AS then accepted responsibility and provided the circumstances regarding the events leading to the violation. (D.I. 80 at PA264) AS searched approximately four individuals. (D.I. 80 at PA274) AS received a five-day paper suspension. (D.I. 70 at DA173, DA230) The other employee, "VB," was charged with assessing information for non-work related reasons.[15] (D.I. 80 at PA212) Throughout the investigation, VB admitted accessing the system for other than work related reasons. (D.I. 80 at PA213) VB explained the reasons s/he looked up certain individuals. VB did not share any of the

---

[14]At her deposition, Durkee testified about why she found plaintiff's justifications implausible:

> And, he also said that certain people had asked him to run DELJIS checks for them when they could have done it themselves. When we went back and asked them had they done it, had they asked plaintiff to do it, they said no. Also, when I said that looking at plaintiff's education and, you know, his background and all of that, could that be aggravating, because it was someone who had been with the company for a long period of time. So obviously, this is somebody who is very ambitious, successful, someone who had a lot of education and training, someone who should have known better. So then all of that combined adds up to why his situation would be different. . . . .Whether or not he could be trusted.

(D.I. 70 at DA185)

[15]VB searched via DELJIS approximately ten individuals. (D.I. 80 at PA213-228)

10

information with anyone and "there was no external complaint generated." (Id.) VB received a three-day paper suspension.

Although plaintiff never denied looking up people on DELJIS, defendant Johnson testified that plaintiff's case was different because of "the amounts of inquiries, the types of inquiries and the people, some of which were employees" and accessing specific offender and complaint information made plaintiff's case much more substantial than the other two employees. (D.I. 70 at DA230) Also, the way that plaintiff's conduct was discovered was different than the other two employees. Significantly, the impetus of the investigation was the call from a member of the public (Hobbs) reporting to the warden's office about inappropriate conduct (later verified) by an SCI employee. (D.I. 70 at DA171, 233)

In correspondence to the EEOC dated February 10, 2012, plaintiff amended his original complaint to add a charge of "retaliation" based on his termination for the DELJIS violations. (D.I. 69 at DA46) Plaintiff asserted that he was being singled out and retaliated against for, among other things, filing the claim of discrimination regarding the captain position. (Id. at DA46-49)

On March 6, 2012, defendant Danberg had a meeting with plaintiff to give him the opportunity to provide a reason why he should not be dismissed. (D.I. 70 at DA261, DA487; D.I. 80 at PA172-173) Also present at the meeting were union members and defendants Johnson and Durkee. (D.I. 69 at DA50) Defendant Danberg was prepared to reverse the termination decision and save plaintiff's job. (D.I. 70 at DA265, DA270) As the meeting progressed, however, defendant Danberg became convinced that plaintiff was lying about the reasons for searching on DELJIS. (Id. at DA262, DA51) At

11

the conclusion of the meeting, defendant Danberg said he would take the matter under

consideration. On April 2, 2012, Defendant Danberg[16] advised plaintiff that "the

_____

[16]Defendant Danberg testified about his decision:

When I was holding the hearing or the meeting with plaintiff, I specifically
asked him about his running of information through DELJIS repeatedly. . . .
He indicated that he had run the history of Hobbs. He explained the
issue with the abusive relationship with his daughter and why he ran
both Hobbs and acquaintances of Hobbs. But there were several
additional individuals whose information he ran. And when he was
confronted with that information, my recollection is that he said he must
have run that license plate because it was a car parked in the parking lot.
Well, it was a person closely associated with Hobbs. I found that the -
and there was no evidence that that person had ever visited the facility.
So I found that his creation of why he ran their license plate number, their
information run through the system to be fabricated with regard to -
          *                              *                              *
He indicated in particular, that he had run the - I don't remember if it was an
employee or the child of an employee. I don't remember that. But he
indicated that he was requested by former Deputy Warden Mike Brittingham
to run information or to get information from - I don't remember who it was
that he was asked to run. Well, at my request, Mr. Brittingham was asked,
and he was no longer employed by the department. He didn't owe the
department anything. He didn't even have to respond. And he said: No,
I never asked him to do that and why would I have asked him to do that
when I have my own DELJIS access? I didn't need him to run it.
And I found Mr. Brittingham to be more credible than plaintiff. And then
he ran Dr. Bradley's information through the system, as well. And he
said that he ran it because Representative John Atkins had contacted
him and specifically asked him to run it. And the problem with him sitting
across the table like this from me and telling me that, what he had no way
of knowing is that John Atkins had requested that information from me. And
so I didn't believe him at the time. But I personally called Representative
Atkins and asked him whether or not he had ever asked that information
of plaintiff. And his response to me was: No, why would I do that? I asked
you. And so based on those conversations, I concluded that plaintiff was
lying to me and he was lying to my face.
In addition, during the hearing I advised him that this was his opportunity.
Regardless of what he said in prior interviews, whatever he had said in the
DELJIS information, this was his opportunity to tell me the truth and set this
record correct. Yet throughout this interview with me, the representative
asked me - had to repeatedly or felt compelled to repeatedly caution her

12

hallmark of a law enforcement officer is honesty" and the appropriate penalty for the

violations was termination of employment. (D.I. 69 at DA50) Plaintiff's union voted not

to take the dismissal to arbitration. (D.I. 66 at A17)

On October 15, 2012, the EEOC notified plaintiff that it was closing its file

because its investigation had not established violations of statutes. (D.I. 69 at DA52)

Plaintiff was further advised of his "right to sue" within 90 days of receipt of the EEOC

correspondence. On January 11, 2013, plaintiff filed the instant complaint. (D.I. 1)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The moving party bears

the burden of proving that no genuine issue of material fact exists. See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

which a rational person could conclude that the position of the person with the burden

of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co.,

57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has

demonstrated an absence of material fact, the nonmoving party then "must come

_____

client that perhaps he didn't understand that he needed to tell me the
truth. I was firmly convinced, when I left that room, that he had lied to me
and that he had lied to me repeatedly.

(D.I. 70 at DA262)

13

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

Plaintiff claims that defendants discriminated against him by denying him a promotion to the rank of captain because he is Hispanic. Plaintiff contends that he was fired in retaliation for filing the EEOC charge. (D.I. 23) Although defendants have

14

moved for summary judgment based on various grounds, for simplicity the court will

consider the dispositive issues related to the captain position and termination.

Title VII prohibits employment discrimination against "any individual" based on

that individual's "race, color, religion, sex, or national origin." 42 U.S.C. §

2000e–2(a)(1). Title VII also prohibits employers from retaliating against employees for

complaining of discrimination based on race, color, religion, sex, or national origin. 42

U.S.C. § 2000e–3(a).

Section 1981 similarly provides that:

> All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of persons and
> property as is enjoyed by white citizens, and shall be subject to like
> punishment, pains, penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981.

Plaintiff's racial discrimination and retaliation claims are analyzed under the

burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973); *see also, Patterson v. McLean Credit Union*, 491 U.S. 164, 186,

(1989) (applying framework to claims under 42 U.S.C. § 1981). Under this framework,

a plaintiff must establish a prima facie case of discrimination or retaliation by showing

that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he

suffered an adverse employment action; and (4) the action occurred under

circumstances that give rise to an inference of unlawful discrimination, such as might

occur when a similarly situated person not of the protected class is treated differently.

15

*Cole v. Delaware Technical and Community College*, 459 F. Supp. 2d 296, 303 (D. Del. 2006). The question of whether a plaintiff has established this prima face case is a question of law to be determined by the court. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n. 7 (3d Cir. 2003).

If the plaintiff successfully establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If this burden is met, the plaintiff must then demonstrate that the defendant's asserted rationale is pretextual. *Id.* 804–05.

The *McDonnell Douglas* framework does not apply in employment discrimination or retaliation cases where there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Plaintiff[17] at bar has presented no direct evidenced of discrimination. He suggests that the deposition testimony and documents demonstrate that SCI has "long had a subjective promotional process for officers" that has allowed selection panels to disregard an objective scoring process in order to promote non-minority candidates. (D.I. 82) Specifically, in 2010, under the objective system, plaintiff scored ahead of JB and DV. In 2011, under the subjective system, plaintiff was ranked third, behind JB and DV. Plaintiff contends that this change was not due to his "bad interview," but to an intentional adjustment to scores to prevent plaintiff from being promoted.

_____

[17]Plaintiff's opposition to the summary judgment motions contains little legal analysis. He submits over 13 pages of "facts," ostensibly, from which the court is called upon to independently cull and piece together specific supporting references.

16

Defendants submit that plaintiff was not selected because of his poor interview performance, specifically, plaintiff stumbled with some answers. In contrast, the selection panel considered JB's interview the best they had witnessed in a long time and found his answers "through, concise and well-articulated." (D.I. 69 at DA25-26)

Poor performance in an interview is recognized as a legitimate nondiscriminatory reason for failure to hire or promote. Carr v. New Jersey, 534 Fed. Appx. 149, 152 (3d Cir. 2013); McCann v. Astrue, 293 Fed. Appx. 848, 852 (3d Cir. 2008); Green v. Potter, No. 08–597, 2010 WL 2557218, at *5 (D. N.J. June 23, 2010). The court finds that defendants have presented evidence that, although the interviewers considered him qualified, he was ranked third behind JB and DV. It is undisputed that all the candidates were asked the same questions by the panel. The interviewers took notes and made comments on the responses. One of the interviewers, defendant Valentino, testified that plaintiff stumbled in his responses.

Having found that defendants have articulated a legitimate, nondiscriminatory reason for the failure to hire plaintiff, the burden shifts back to plaintiff to show that defendants' explanation was merely a pretext for its actions. While plaintiff seems to suggest that the hiring and promotional history at SCI, with respect to ranks higher than captain, demonstrates discriminatory intent, the court concludes that plaintiff has failed to show sufficient evidence from which a reasonable juror could conclude that defendants' legitimate, nondiscriminatory reason was pretext. The court will grant summary judgment for defendants on this claim for racial discrimination in violation of Title VII and § 1981.

17

To establish a prima facie claim for retaliation under Title VII, plaintiff must show that: (1) he engaged in a protected activity; (2) there was an adverse employment action after or contemporaneous with the protected activity; and (3) the protected activity and the adverse employment action were causally linked. *Moore v. Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006); *Hussein v. UPMC Mercy Hosp.*, 466 Fed. Appx. 108, 112 (3d Cir. 2012). The protected activity must be the "but-for" cause of the defendants' alleged retaliatory action under the causation prong of the prima facie case. *Univ. Of Tex. S. Med. Ctr. V. Nassar*, __ U.S. ___, 133 S.Ct. 2517 (2013).

If the plaintiff proves a prima facie retaliation claim, the *McDonnell Douglas* burden-shifting analysis applies in which the defendant is then obligated to advance a legitimate, non-retaliatory purpose for its adverse employment action. *Moore*, 461 F.3d at 342. If the defendant does so, the burden shifts back to the plaintiff to prove the defendant's adverse action was a pretext for retaliation. *Id.* Where the plaintiff fails to raise a genuine issue of material fact for each element of his retaliation claim, summary judgment should be granted to the defendant. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (1997).

Plaintiff argues that he engaged in activity protected by Title VII by reporting racial discrimination to the EEOC and, as a result, suffered a materially adverse employment action - termination. He avers that deposition testimony and documents support a causal connection between his reporting the racial discrimination and his termination.

Viewing the facts in the light most favorable to the non-movant, plaintiff's Title VII retaliation claim cannot survive a motion for summary judgment. Plaintiff has established the first and second prongs of a prima facie case, however, he has not demonstrated that the filing of the EEOC charge was the "but- for" reason for the termination. Although the filling of the EEOC charge and the termination occurred within a short time period, temporal proximity alone is insufficient to overcome a defendant's allegations of pretext. *Andes v. N.J. City Univ.*, 419 Fed. Appx. 230, 234 (3d Cir. 2011) (finding that court erred in focusing exclusively on temporal proximity when it found no causal connection between the protected activity and the alleged retaliatory conduct); *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.").

Moreover, a closer examination of the events reveals that an intervening and independent event caused plaintiff's termination, that is, the DELJIS investigation. On April 8, 2011, Hobbs contacted the warden's office, complaining that plaintiff had accessed Hobbs' criminal record illegally through DELJIS. As a result, an IA investigation was launched. On April 15, 2011, defendant Valentino announced that the panel had chosen JB for the captain position, not plaintiff. Plaintiff filed a grievance on May 24, 2011 and the EEOC charge on September 21, 2011, subsequent to the DELJIS investigation.

This investigation ultimately revealed that plaintiff had committed extensive DELJIS violations. Plaintiff was afforded several opportunities to address and explain

19

his conduct. Yet plaintiff continued to offer explanations that proved implausible and/or false. Defendant Danberg was prepared to reverse the termination recommendation. During their March 6, 2012 meeting, however, defendant Danberg concluded that plaintiff was not telling the truth. Since he considered honesty a "hallmark of a law enforcement officer," defendant Danberg concluded that plaintiff's deception was sufficiently compelling to warrant termination. This is a non-retaliatory and legitimate reason for the termination. Plaintiff has presented nothing demonstrating that defendant Danberg ordered termination because plaintiff had initiated an EEOC charge. Similarly, the record does not evince that any of the other defendants acted against plaintiff because of the EEOC charge.

With respect to the claims under the Fourteenth Amendment's right of equal protection under 42 U.S.C. § 1983, a plaintiff must demonstrate purposeful discrimination in order to prevail. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990). The *McDonnell Douglas* framework applies to allegations of racial discrimination. *Stewart v. Rutgers, The State University*, 120 F.3d 426, 432 (3d Cir. 1997). Both parties rely on the arguments made under plaintiff's Title VII claim with regard to plaintiff's equal protection claim based on race discrimination. Accordingly, for the same reasons the court provided for finding against plaintiff on his Title VII claim, a summary judgment on his equal protection claim shall be entered as well.

Having concluded that summary judgment of the federal claims is appropriate, the court will exercise its discretion and will decline to exercise supplemental jurisdiction over plaintiff's claims for tortious interference and under the Whistleblowers' Act. See 28 U.S.C. § 1367©; *see also, Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639-

20

40 (2009) (noting purely discretionary abuse of standard of review); *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003).

## V. CONCLUSION

For the reasons stated, defendants' motions for summary judgment are granted. An order shall issue.